*Coffee Exchange — expulsion of a member because of a refusal to pay for adulterated coffee — the question as to the alleged adulteration is one to be decided by the Exchange.*

Upon an application made by one Theodor G. Lurman for a peremptory mandamus compelling the Coffee Exchange of New York to restore him to full privileges as a member thereof, the following facts appeared : Lurman agreed to purchase coffee of a certain grade from W. H. Crossman & Bro., under a contract which stipulated that the coffee should be graded by Mackey & Small, and that if their grading were unsatisfactory to Lurman he should appoint a grader, and, in the event of his average grading differing from that first made, the two graders should name a third who should act as arbitrator; and that the average grading named by him should be accepted as the basis for the sale price.

Mackey & Small declared the coffee to be according to contract, but the vendee asserting that it was adulterated, and, therefore, not lawful to be dealt in, refused to appoint a grader, and appealed to the Exchange, whereupon adjudicators were appointed, one on each side, and these two selected a third, before whom Lurman claimed that the coffee was artificially colored.

The decision of the adjudicators was not unanimous, the one appointed by Lurman declaring that the coffee was artificially colored, while the other two refused to examine the coffee, and decided that even if it were colored this was not a sufficient ground for Lurman's refusal to have it graded; and that they had no jurisdiction of the grade, or of the condition of the coffee.

Lurman appealed to the board of managers of the Exchange, stating that the adjudicators had refused to examine his objections, but the board decided the appeal against him. Subsequently Lurman and W. H. Crossman & Bro. each appointed a grader, and, these being unable to agree, chose a third as arbitrator, a majority of whom decided not that the coffee was free from adulteration, but that it was of the grade prescribed by the contract.

No appeal was taken by Lurman from this decision, there being no provision in the by-laws of the Exchange for such an appeal.

Lurman still refusing to accept the coffee, W. H. Crossman & Bro. lodged a complaint with the adjudication committee of the Exchange, before which Lurmam appeared and filed a reply, in which he made the same objections, offered to make proof of them, and to show that the coffee was adulterated within the meaning of section 41, chapter 661 of the Laws of 1893. It was admitted that portions of the coffee were colored, but the committee held that as the arbitrators had decided that the coffee was fit to be tendered, the committee could not reopen the question of grade, quality or condition, and the cross-complaint made by Lurman was dismissed.

The adjudication committee made a report to the board of managers of the Exchange which appointed a hearing of the matter, but neither on this hearing nor on the hearing before the adjudicators was there any inquiry made as to the alleged adulteration, the only question considered being whether the coffee was of the grade required by the contract. The Exchange decided that Lurman had violated its rules and by-laws, and that unless he settled with W. H. Crossman & Bro. before a certain date he should be suspended from membership. Upon his refusal to settle he was suspended.

*Held*, that, assuming that the coffee was up to grade, Lurman was still entitled to a decision, on the merits, of the question whether the coffee was adulterated;

That, if it were adulterated within the meaning of section 41 of chapter 661 of the Laws of 1893, it was an article in which it was unlawful to deal, no matter what its grade might be;

That, in view of the statute, the question of adulteration could not be delegated by the Exchange to graders;

That the Exchange could not deprive of membership a person who refused to do an act, upon the ground of its illegality, without an investigation and a decision upon the question whether the position taken by the member was justifiable.

APPEAL by the petitioner, Theodor G. Lurman, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 11th day of July, 1895, denying his application for a peremptory writ of mandamus directed to The Coffee Exchange of the city of New York commanding it to reinstate him in his full privileges as a member thereof.

In July, 1894, the petitioner's firm entered into a contract with Messrs. W. H. Crossman & Bro. for the purchase of coffee of a certain average grade. The contract provided that the coffee should be graded by Mackey & Small; that should their grading be unsatisfactory to the buyer the latter should appoint a grader, and, in the event of his average grading differing from that first submitted to the buyer, the two graders should name a third, who should act as arbitrator, and that the average grading named by him should be accepted by seller and buyer as the basis for the sale price. Both the petitioner and the members of the firm of Crossman & Bro. are members of the Coffee Exchange of the city of New York. By its charter it is provided that the purpose of the exchange shall be, among other things, "to adjust controversies between its members; to inculcate and establish just and equitable principles in the trade; to establish and maintain uniformity in its rules, regulations

and usages; to adopt standards of classification." Under the rules of the Exchange a tender of coffee is not good if the fact is shown that the coffee has been treated or manipulated with the result of concealing defects or of making it appear to be better or of greater value than it really is. This contract was not made within or upon the Exchange.

On the arrival of the coffee it was graded by Mackey & Small and declared by them to accord with the contract. When it was tendered the vendees refused to accept it on the ground that it was adulterated, and, therefore, not lawful to be dealt in, and for the same reason they declined to appoint a grader, and appealed to the exchange to have this controversy determined under the rules of that body by adjudication. Adjudicators, members of the Exchange, were appointed, one by each side, and these two selected a third. The vendees claimed before them that the coffee was artificially colored, and that that fact of itself was sufficient ground for rejection of the coffee. The adjudicators were not unanimous in their decision. The one chosen by the petitioner stated that he had a chemist's analysis of the coffee showing that it was artificially colored, but the other two refused to examine it, and decided that, even if it was adulterated, that fact did not justify a refusal to submit the coffee to grading, and that they had no jurisdiction of the question of the grade or condition of the coffee. From this decision the petitioner appealed to the board of managers of the Exchange, making the same claims in regard to adulteration as before the adjudicators, and stating that the majority of the adjudicators had declined to consider them. A ballot taken by the board on the appeal resulted in a tie and the appeal was declared lost.

The petitioner's firm and Crossman & Bro. thereupon each appointed a grader, who, being unable to agree in all respects, chose a third man as arbitrator. The petitioner swears that the grader chosen by his firm refused to grade the adulterated coffee. The other grader and the arbitrator say that all three agreed as to the condition of some of the coffee, but neither of them says whether the coffee as to which there was a dispute was or was not adulterated. They both declare, in substance, that no evidence was produced before them as to the intent with which the coloring had been

effected, and that its effect was not to make the coffee appear to them better or of greater value than it really was; and one of them says he submitted a portion of it to a chemist, who reported to him orally that it contained nothing deleterious. Crossman & Bro.'s grader and the arbitrator accordingly decided, not that the coffee was free from adulteration, but that it was of the grade prescribed in the contract. No appeal was taken from this decision to the Exchange, and it appears that if one had been taken it would not have been considered, the by-laws making no provision for such an appeal, and an appeal in a similar case, with respect to another portion of the same shipment, having been refused.

As the petitioner's firm still refused to accept delivery Crossman & Bro. lodged a complaint against them with the adjudication committee of the Exchange. The petitioner appeared before this committee and filed a reply on behalf of his firm, making the same claims as they had theretofore made and offering proof by letter and telegram from their grader, and sworn certificate of chemical analysis, to show that the coffee was artificially colored or painted; and also offering to prove by witnesses, unless the fact should be admitted on the record, that the coffees objected to were adulterated within the meaning of the statute, and his statement is uncontroverted, that "it was admitted by Mr. George W. Crossman, who appeared on behalf of his said firm, that portions of the coffee were polished and colored." It further appears that the official record of the proceedings of the adjudication committee states that "while the graders admitted that the coffee in question is colored, they nevertheless declared that it was a good delivery under the contract." The committee decided that, as there was no dispute that the grade arbitrators had held that the coffee tendered was a valid fulfillment of the contract, they could not reopen the question of grade, quality or condition, and that the vendees in not receiving and paying for the coffee (portions of which the vendors had admitted before them were polished and colored) had violated the by-laws of the Exchange, and the complaint of the vendors was unanimously sustained.

On the same day that Crossman & Bro.'s complaint was presented, the petitioner also presented complaints against Crossman & Bro. and others, covering this entire matter, and with them a written statement in relation thereto, together with a copy of the

applicable portions of chapter 661 of the Laws of 1893 and of the Penal Code, all of which complaints were dismissed.

The adjudication committee made their report to the board of managers of the Exchange with recommendations and suggestions, and a hearing before the latter board was appointed. The petitioner and his firm, who still refused to receive the goods, did not personally attend, but were allowed instead to submit the same written statement which they had laid before the adjudication committee. On behalf of Crossman & Bro. a copy of a report of chemists and certificate of analysis was presented. The report states that the "analysis was directed especially to ascertain whether or not the coffee had been artificially colored with any injurious coloring material. You will note that we find no such adulterant present." And the certificate of analysis says: "We * * * are unable to find any deleterious foreign matter present, either mineral or organic. We have to report that the coffee is free from any such adulteration." The president of the Exchange in his affidavit says that the hearings before the board of managers and the adjudication committee were not hearings upon the ultimate controversy as to the alleged adulteration of the coffee. The decision of the board of managers was "that Mr. Theo. G. Lurman be and hereby is censured by this Board for having violated the by-laws and rules of this Exchange, and that unless he settles with Messrs. W. H. Crossman & Bro. in full before twelve M. on Friday, the 19th inst., Mr. Theodor G. Lurman shall stand suspended from all the privileges of the Exchange for the period of one year."

Against this decision the petitioner presented a protest in writing, going over the whole ground, and stating that for any pecuniary loss which the firm might suffer by reason thereof they would hold the president and board of managers responsible. Thereafter a further resolution was adopted by said board extending the time for the petitioner to accept and pay for the goods under pain of suspension, to Monday, October 22, 1894, and as he has ever since refused to receive and accept the goods, he has remained from that time suspended from said Exchange.

*Charles Stewart Davison*, for the appellant.

*Edward M. Shepard*, for the respondent.

O'BRIEN, J. :

From the outset of the controversy which resulted in the suspension of the petitioner, he consistently took the position that he could not be required to accept a delivery of the coffee because it was artificially colored or adulterated. If this position could be maintained, then, notwithstanding any by-law or rule of the Exchange to the contrary, he could not be forced to accept a delivery of such coffees, for the reason that the trading in such contravenes the express statute of this State (Chap. 661 of the Laws of 1893, § 41), which provides: "No person shall within the State    *    *    *    have, sell or offer for sale any adulterated food or drug.    An article shall be deemed to be adulterated within the meaning of this act    *    *    * in the case of food    *    *    *    if it be colored or coated or polished or powdered, whereby damage is concealed, or it is made to appear better than it really is, or of greater value."

Although the Exchange, through its various committees, as shown, was appealed to, and though graders were appointed pursuant to the terms of the contract, it is insisted by the petitioner that this claim was never considered or heard upon the merits, the position taken by the Exchange being that the contract between the parties called for a grading by arbitration, and that such graders having decided that the coffee tendered was up to the grade fixed by the contract, the petitioner should accept and pay for the coffee    The petitioner appealed originally to the Exchange ; they refused to consider the question of whether the coffee was adulterated or not, and compelled the petitioner to name a grader, and thereafter persisted in refusing to make any examination of the question of fact as to the adulteration on its merits, taking the stand that they would not review the original decision of the graders. As contended by the petitioner, therefore, the practical result is, that the vendees named a grader under compulsion ; that they have attempted by every method of procedure open under the by-laws of the Exchange, to get a review of the decision of the graders, but that they have failed ; and that this failure has been in the face of the uncontroverted fact of artificial coloration.

If we assume, as did the Exchange, that the coffee was up to grade, the question remains whether or not the petitioner was entitled to have a determination on the merits upon his claim that the

coffee was adulterated; and if he was entitled to such a hearing upon the merits, whether it was extended or had, in any of the methods of procedure adopted.

We think it requires a mere reference to the statute quoted from to sustain the proposition that neither the Exchange nor its members could engage in trading in adulterated coffee, and that such coffee, though it might be equal to the grade of that called for by a contract, could not be made the subject of a lawful delivery. This is but another way of stating that the penal statutes of the State cannot be disregarded either by individuals or corporations. That this coffee or some portion of it was colored is conceded by all who examined it, but whether this was a natural or artificial coloring underlies the question as to whether it was adulterated. If a suit had been brought after tender against the vendees to recover damages for refusal to accept, it would have been a good defense, if proven, to show that the coffee tendered was adulterated. If, instead of suing, a vendor sets in motion the machinery of an Exchange, and the question whether one of its members has made a tender of goods which it is unlawful to trade in is submitted to them, there must in such exchange be some hearing on the merits at some point, before a person is deprived of rights within a private corporation to which *prima facie* he is entitled. Nor do we think that such Exchange could relegate the determination of such a question to a lay tribunal called graders, and because of their report that the goods are not unlawful, refuse to give one of its members the benefit of a review or a hearing on the merits before depriving him of his membership.

We are thus to determine the second question suggested as to whether there was a hearing, either by the graders or by any committee of the Exchange, or by the Exchange itself, upon the merits as to whether this coffee was or was not adulterated. We do not think it is claimed that before any committee of the Exchange or in any of the proceedings that were taken by that body the merits of the controversy as to the adulteration were inquired into, the whole machinery of the Exchange being seemingly brought to support the proposition that it would allow no investigation of any kind of an official character upon the question of fact as to whether the coffees tendered to the petitioner, for his refusal to receive which he was

suspended, were or were not, as alleged by him, adulterated — in other words, were or were not goods contravening the express statute of the State. As shown by the affidavit of the superintendent of the Exchange, the adjudicators did not consider any evidence of the unlawful coloring of the coffee, "because it was expressly provided by the contract that the question of the grade of coffee should be considered by another tribunal." It will thus be seen that the Exchange begged and overlooked the real question, and because the graders had decided that the coffee was up to grade they refused to enter upon an examination of the question as to whether it was or was not adulterated, or to assume the obligation and responsibility which rested upon it or its board of managers of determining whether one of their members was right in refusing to do what the law says he should not do, viz., trade in adulterated coffees. Throughout, the Exchange and its different committees and managers place themselves upon the technical regularity of the proceedings which remitted to the persons who had the right to pass upon the grade the question whether the coffees tendered were coffees which the petitioner should receive under his contract; and upon their conclusion that the coffee was up to grade, the Exchange set in motion its whole machinery, even to suspending the petitioner, in order to enforce the decision thus made by such outside tribunal.

In this connection it must not be overlooked that, apart from the money involved, the petitioner had at stake his membership in the exchange, and because he would not give up an amount of money which, if he were right, he could not legally be required to do, he was, without any hearing by the Exchange itself, deprived of his membership. Thinking as we do, that, regardless of what may have been done by the graders, the Exchange could not deprive one of its members of his membership for refusing to do what he claimed to be an unlawful act without inquiry, investigation and decision as to whether this claim was justified, this of itself would be sufficient to warrant a reversal of the order and a reinstatement of the member and a remission of the whole question again to the Exchange, to the end that the member should have a hearing upon the merits.

It is doubtful, to say the least, if even the graders, upon whose decision so much reliance was placed by the Exchange, ever consid-

ered the petitioner's claim as to adulteration, they seemingly being as anxious to avoid this question as the Exchange itself, and as shown by their affidavits they confined their attention to determining whether or not the coffee was or was not up to grade. Just what they considered to be their duty and their view of the controversy, and what questions they considered, are well set forth in the affidavit of one of the graders, who states: "In grading coffee, the graders and grade arbitrators consider the grade, quality and condition of the coffee. If the coffee contain black beans or imperfect beans, an allowance for such is made; so, if the coffee contain stones or sticks or foreign substance of any kind, a proper allowance for that defect is made; so, if there be any foreign substance adhering to or contained in the beans of coffee, whether coloring it or not, or if it appear that the coffee has been manipulated or treated in any way, that is an element which the graders and grade arbitrators must consider. Indeed, it is the duty of the graders and grade arbitrators to consider every element of grade, quality or condition." It will thus be seen that they were giving little or no attention to the question of whether the coffee was adulterated, and were confining their attention, as they deemed it their duty to do, to a consideration of whether it was or was not up to grade.

That this particular lot had coloring matter upon it is conceded by all who saw the coffee, thus raising at least a fair presumption that the claim advanced by the petitioner was based upon some foundation and was made in apparent good faith. Notwithstanding this, the record shows that the graders and the Exchange were seemingly fearful of the issue and studiously avoided ever giving a hearing on the merits to the claim advanced, and devoted their time to a consideration of the question as to whether the tender of the coffees was according to the contract, and regardless of whether it was adulterated or not, and as to whether it was unlawful or not, and the Exchange endeavored, by the strongest means within its power, by the act of suspension, to compel the petitioner to do what, if his claim is right, would be a criminal act and subject him to the penalties prescribed by the statute. It is unnecessary to say that this the Exchange has no power to do, because it requires no array of legal authorities to support the proposition that, neither by private contract nor by the by-laws of any Exchange, can the laws of a State be abrogated or disregarded.

We think, upon an examination of the entire record, that the petitioner is entitled to a hearing upon the merits, which he has never obtained, and to that end, that he should be restored to his membership, and that then the whole subject should be referred to the Exchange, who should in some appropriate manner, before suspending or expelling the petitioner, give him a hearing upon the merits of his claim to which by law he is entitled.

Order reversed accordingly, with costs and disbursements.

VAN BRUNT, P. J., and PARKER, J., concurred.

Order reversed, with costs and disbursements.